IN THE UNITED STATES DISTRICT

COURT DISTRICT OF UTAH

| | |
|---|---|
| JAMIE HERRMANN,<br><br>Plaintiff,<br><br>v.<br><br>SALT LAKE CITY CORPORATION<br>(SALT LAKE CITY JUSTICE COURT)<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Case No.: 2:17-CV-00324<br><br>Judge: Clark Waddoups |

Before the court is Defendant's Motion for Summary Judgment, (ECF No. 30). As explained below, the court GRANTS the Motion.

## Background Facts

In May 2002, Salt Lake City Corporation, (the City) hired Jamie Herrmann (Ms. Herrmann) as a "City Payments Processor" for the Salt Lake City Justice Court. (ECF No. 31-1 at 2, Herrmann Depo. 8: 10–16.) She worked in that same position until June 2008, when she was offered and accepted a "new Justice Court Clerk" position. (ECF No. 31-2 at 1.) In April 2011, Ms. Herrmann accepted a position as an "in court clerk." (ECF No. 31-4 at 1.)

## Undisputed Facts

### Ms. Herrmann's Duties and Work Performance

"As a court clerk, Ms. Herrmann's responsibilities include[d] duties both inside and outside the courtroom, such as documenting minute entries, timely updating case filing, following up with treatment providers to determine if a defendant had completed court-ordered treatment or other conditions of probation, and handling inquiries from members of the public,

attorneys, defendants and outside service providers." (ECF No. 30 at 8; ECF No. 37 at 10.) "Ms. Herrmann's supervisors began informally addressing Ms. Herrmann's work performance issues with Ms. Herrmann as early as 2009 through in-person meetings and emails, bringing Ms. Herrmann's attention to various errors, and repeatedly reminding her of the importance of timely filing." (ECF No. 30 at 8–9; ECF No. 37 at 10.) "In May 2012, Ms. Herrmann's supervisors had another meeting with Ms. Herrmann to discuss her tardy filing." (ECF No. 30 at 9; ECF No. 37 at 10.) "Ms. Herrmann was warned that formal discipline would occur if this issue arose again." (ECF No. 30 at 9; ECF No. 37 at 10.) "Over the next few months Ms. Herrmann continued to fall behind on her filing." (ECF No. 30 at 9; ECF No. 37 at 10.) "As a result, Ms. Herrmann received a Coach and Counsel for failing to meet job performance standards and goals, including tardiness in filing, and for taking time off work without sufficient available leave." (ECF No. 30 at 9; ECF No. 37 at 10.)

"The Coach and Counsel was later modified to address only the issue of taking time off without leave, but Ms. Herrmann was warned that any further disciplinary action would progress to a written warning." (ECF No. 30 at 9; ECF No. 37 at 10.) "When Ms. Herrmann's work performance still had not improved one year later, she received a written warning that specifically addressed her persistent failure to meet the Justice Court's timely filing expectation." (ECF No. 30 at 9; ECF No. 37 at 10.)

"Shortly after the issuance of the written warning, and at Ms. Herrmann's request, Ms. Herrmann received additional one-on-one training in the proper performance of her Court Clerk duties." (ECF No. 30 at 10; ECF No. 37 at 10.) "This training was documented in a written memorandum dated January 9, 2014." (ECF No. 30 at 10; ECF No. 37 at 10.) "This memorandum also set forth the Justice Court's expectation that: i) Ms. Herrmann would be fully

trained and handling certain in-court clerk duties by January 16, 2014; and ii) her filing would be up-to-date by February 10, 2014." (ECF No. 30 at 10; ECF No. 37 at 10.) "This deadline was later extended to February 20, 2014, to accommodate the fact that Ms. Herrmann missed approximately 25 hours of work between January 9 and February 10 due to medical issues related to migraine headaches." (ECF No. 30 at 10; ECF No. 37 at 10.)

"Throughout January and February 2014, Ms. Herrmann continued to make errors and remained significantly behind on her filing, with her supervisors spending significant time providing ongoing individualized training and providing her additional assistance to bring her filing current." (ECF No. 30 at 10; ECF No. 37 at 10.) "On February 18, 2014, two days before Ms. Herrmann's filing was expected to be up-to-date, Ms. Herrmann informed her supervisors that she was scheduled for surgery on February 28, 2014 and would not return for up to 90 days." (ECF No. 30 at 10; ECF No. 37 at 10.) "Given Ms. Herrmann's impending absence, all follow-up regarding Ms. Herrmann's work performance was postponed until she returned from leave." (ECF No. 30 at 11; ECF No. 37 at 10.)

Ms. Herrmann Receives a Two-Day Suspension

"On April 14, 2014, Ms. Herrmann returned from leave." (ECF No. 30 at 11; ECF No. 37 at 10.) On April 23, 2014, Ms. Herrmann and her union representative Brooke Orgill, attended a follow-up meeting with Ms. Herrmann's supervisors. (ECF No. 30 at 11; ECF No. 37 at 10.) They discussed "Ms. Herrmann's work performance and expectations . . . ." (ECF No. 30 at 11; ECF No. 37 at 10.) "A follow-up meeting in thirty days was planned for the purpose of determining if there had been any improvement in Ms. Herrmann's work performance." (ECF No. 30 at 11; ECF No. 37 at 10.) "On May 6, 2014, Ms. Herrmann's supervisor contacted Ms. Herrmann and scheduled the thirty-day follow-up meeting . . . ." (ECF No. 30 at 11; ECF No. 37

at 10.)

"The same day Ms. Herrmann's supervisor scheduled the follow-up meeting, Ms. Herrmann contacted Melissa Green, the City's Equal Employment Opportunity Program Manager and requested ADA paperwork." (ECF No. 30 at 11; ECF No. 37 at 10.) On May 7, 2014, Ms. Green provided the ADA paperwork to Ms. Herrmann. (ECF No. 31-17 at 1.)

On June 9, 2014, "Ms. Herrmann's supervisors met with Ms. Herrmann to discuss if there had been any improvement in Ms. Herrmann's work performance." (ECF No. 30 at 12; ECF No. 37 at 10.) "During that meeting, Ms. Herrmann's supervisors expressed their concerns regarding errors Ms. Herrmann was continuing to make when updating files, including Ms. Herrmann recalling a warrant without judicial approval," an "error the judge had addressed directly with Ms. Herrmann." (ECF No. 30 at 12; ECF No. 37 at 10.) "They also told Ms. Herrmann they were receiving complaints about Ms. Herrmann's work performance from the Judge to whom she was assigned that she was not prepared before Court began and that she was continuing to fail to timely update files." (ECF No. 30 at 12; ECF No. 37 at 10.) "The day after the June 9 meeting, Ms. Herrmann's supervisors conducted an audit of Ms. Herrmann's desk and discovered Ms. Herrmann had paperwork dating back several weeks." (ECF No. 30 at 12; ECF No. 37 at 10.)

"Due to this and other performance issues, Ms. Herrmann's supervisors issued a predetermination hearing notice to Ms. Herrmann." (ECF No. 30 at 13; ECF No. 37 at 10.) "The pre-determination hearing was held on June 23, 2014 and, one week later, the department issued a two-day suspension without pay to Ms. Herrmann, which took place on July 13 and 14." (ECF No. 30 at 13; ECF No. 37 at 10.)

<u>Ms. Herrmann Submits Her First Request for Accommodation and Takes Leave of Absence</u>

"On or about July 13, 2014 . . . during Ms. Herrmann's suspension for poor work

performance and ten weeks after Ms. Green emailed ADA paperwork to Ms. Herrmann, Mr.

Klein, a licensed clinical social worker, returned completed paperwork to the City on behalf of

Ms. Herrmann." (ECF No. 30 at 13; ECF No. 37 at 10.) In this paperwork, Mr. Klein explained

that "Ms. Herrmann ha[d] expressed [to him] that being in court while domestic violence cases

are being heard triggers her issues as a result of personal traumas she has suffered." (ECF No.

31-22 at 2.) He also wrote that Ms. Herrmann's productivity "appears to be markedly reduced

when," among other things she is in court and "there are domestic violence cases," because "her

personal issues surrounding such dynamics are triggered, resulting in marked increase of

anxiety." (ECF No. 31-22 at 4.) He also provided that "[a]ny reasonable accommodations that

would eschew a spike in anxiety would likely yield positive results for Ms. Herrmann . . . ."

(ECF No. 31-22 at 2.)

On August 7, 2014, Ms. Green had a meeting with Ms. Herrmann to discuss her request

to be removed from domestic violence cases. (*See* ECF No. 31-1 at 21, Herrmann Depo. 84: 19–

23.) "Ms. Green understood from that meeting that Ms. Herrmann's request was to be removed

from all domestic violence cases." (ECF No. 30 at 14; ECF No. 37 at 9.) "At the August 7

meeting, Ms. Green explained to Ms. Herrmann that the next step [would be] for Ms. Green to

talk with the department to see if her request could be accommodated." (ECF No. 30 at 14; ECF

No. 37 at 9.) After meeting with Curtis Preece and Tammy Shelton, "Ms. Green learned . . . that

domestic violence cases touch many aspects of a court clerk's duties, including pre-trials, bench

trials, motion hearings, jury trials, paperwork, responding to inquiries from the public, or

following up with treatment providers." (ECF No 30 at 14; ECF No. 37 at 9.)

On August 15, 2014, Ms. Green sent Ms. Herrmann an email asking Ms. Herrmann to

clarify "the extent to which you want to be excused from all domestic violence cases." (ECF No.

31-25 at 2.) On August 18, 2014, Ms. Herrmann responded in an email that provided: "I would like to come and see you . . when you have time[.]" (ECF No. 31-25 at 2.) That same day, Ms. Green responded by saying that she could "meet Wednesday afternoon." (ECF No. 31-25 at 2.) Ms. Herrmann agreed to a meeting for Wednesday. (*See* ECF No. 31-25 at 2.) There is no genuine dispute that Ms. Herrmann did not attend the scheduled meeting. (*See* ECF No. 30 at 16; ECF No. 37 at 11.) There is also no genuine dispute that Ms. Herrmann "made no attempt to contact Ms. Green and tell her she would not be attending the meeting and made no attempt to reschedule the meeting." (ECF No. 30 at 16–17.)

On August 22, 2014, after Ms. Herrmann failed to attend the meeting, Ms. Green wrote an email to Ms. Herrmann that provided: "I have not heard from you and you did not come to the meeting you requested for Wednesday. In order for me to evaluate your ADA request, I need the information I requested last Friday." (ECF No. 31-25 at 1.) There is no genuine dispute that Ms. Herrmann did not respond to this email. (ECF No. 30 at 17; ECF No. 37 at 11.)

There is no genuine dispute that on August 25, 2014, the City "received documents requesting continuous FMLA leave for Ms. Herrmann for a period of six months, back dated to August 19, 2014." (ECF No. 30 at 17.) Ms. Herrmann's "FMLA request was processed and approved for an initial period through October 14, 2014." (ECF No. 30 at 17; ECF No. 37 at 9.) "This was later extended to November 13, 2014, at which time Ms. Herrmann would exhaust all available FMLA leave for that year." (ECF No. 30 at 17; ECF No. 37 at 9.) "Ms. Herrmann was provided notice of this fact." (ECF No. 30 at 17; ECF No. 37 at 9.)

On September 15, 2014, Ms. Green sent Ms. Herrmann a letter that provided, in relevant part, that "[i]n order to review your request for an accommodation," she would "need additional information from" Ms. Herrmann. (ECF No. 31-34 at 1.) On September 21, 2014, Ms. Herrmann

responded, requesting that "a new copy [be] sent to" her. (ECF No. 31-35 at 1.)  On September

22, 2014, Ms. Green responded, writing: "I am not sure what you are asking for in your request

for a new copy. Can you please clarify?" (ECF No. 31-35 at 1.) That same day, Ms. Herrmann

responded that her counselor and doctor "want to request as part of the accommodation that I do

not return to the court but a different position within Salt Lake City Corporation." (ECF No. 31-

35 at 1.) On September 23, 2014, Ms. Green responded:

> If we determine that there is not a reasonable accommodation that would enable
> you to do your current position, then we can consider transferring you into an
> open position within the City that is at the same or lower level as your current
> position.  I have the medical provider's paperwork that was signed on July 13,
> 2014. This, along with the information you provided, is the information I am
> using to consider an accommodation to your current position. If your situation has
> changed, I have attached new paperwork for you and your medical provider to
> complete.

(ECF No. 31-35 at 1.) Approximately one week later, "Ms. Herrmann contacted Ms. Green and

asked what her counselor should write so she did not have to return to the Court." (ECF No. 30

at 19.) "Ms. Green advised that it was an individualized assessment that her medical provider

should make and that Ms. Green could not advise Ms. Herrmann's medical provider what to

write on the ADA forms." (ECF No. 30 at 19; ECF No. 37 at 9.) It is undisputed that Ms.

Herrmann "never answered Ms. Green's question or otherwise clarified for Ms. Green if she was

requesting removal from all work on domestic violence cases or whether there were some tasks .

. . that she was able to perform." (ECF No. 30 at 19; ECF No. 37 at 9.)

<u>Ms. Herrmann Submits a New Request to Be Accommodated and is Separated from Her
Employment</u>

"[O]n October 7, 2014, Mr. Klein . . . faxed a new completed ADA form to the City."

(ECF No. 30 at 19; ECF No. 37 at 9.) He wrote, in relevant part, that "[t]here is a high

probability Jamie will be able to return to a productive work life in a different department." (ECF

7

No. 31-37 at 3.) He also wrote that he:

> would recommend Ms. Herrmann be given the opportunity to work in a different
> department with different supervisors. Finding a good supervisory fit is essential
> to her productivity. I would further recommend avoidance of any work related to
> domestic violence, as this triggers her PTSD, migraines and results in her needing
> to take time off to recover.

(ECF No. 31-37 at 3.) "Mr. Klein made this recommendation after listening to tape recordings of

conversations Ms. Herrmann had with her supervisors, which Ms. Herrmann apparently brought

to and played in a counselling session:" (ECF No. 30 at 20; ECF No. 37 at 9.)

> In a recent session with Jamie, she brought in a tape recorder of some of the
> conversations she had with both supervisors. It was apparent this current work
> situation is not the best fit for employee and employer. The interactions I heard on
> the recordings are counter-productive for someone with PTSD. The supervisors
> were aggressive, interrupted Jamie repeatedly, threatened her job and even called
> her a liar. It was clear the supervisors are not professional managers by their
> callous tone and threats. Jamie had reported to me on several occasions she is in a
> hostile work environment. After listening to the recordings, I would concur and
> add harassment to the scenario.

(ECF No. 31-37 at 3.)

"On October 15, 2014, Ms. Herrmann followed up with Ms. Green asking if she had

reviewed the newly submitted ADA paperwork." (ECF No. 30 at 20; ECF No. 37 at 9.) "Ms.

Green responded the following day, requesting copies of or the opportunity to be able to listen to

the recordings by October 24, 2014, so she could follow-up on the concerns raised in the request

about how Ms. Herrmann was being treated in the workplace." (ECF No. 30 at 20.) There is no

genuine dispute that on October 23, 2014, Ms. Herrmann responded by writing to Ms. Green that

she "was told the recordings are irrelevant to [Ms. Green] making the [ADA] accommodation."

(ECF No. 31-38 at 1.) "Ms. Green responded the following day explaining the recordings were

relevant to Ms. Herrmann's recent request because Ms. Herrmann had asked the City to

accommodate her by finding her 'a good supervisory fit' and to be able to begin to determine

what might be a 'good supervisory fit,' Ms. Green needed to understand what about the current situation was not a good supervisory a fit." (ECF No. 30 at 21; ECF No. 37 at 9.) "A meeting was scheduled for October 28, 2014." (ECF No. 30 at 21; ECF No. 37 at 9.)

There is no genuine dispute that "at the October 28, 2014 meeting, Ms. Herrmann played a portion of a recording for Ms. Green, but Ms. Green did not hear any of the conduct Ms. Herrmann and Mr. Klein claimed or described." (*See* ECF No. 30 at 21; ECF No. 37 at 13.) "Ms. Herrmann claimed that she had another recording where her supervisor was yelling at her and that she would identify the recording and provide Ms. Green a copy." (ECF No. 30 at 21; ECF No. 37 at 9.)

There is no genuine dispute that "[o]n November 4, 2014, the City sent Ms. Herrmann a Notice of Intent to Separate from Employment Due to Unavailability." (*See* ECF No. 30 at 22; ECF No. 37 at 13.) "The Notice informed Ms. Herrrmann that she would exhaust her continuous FMLA leave on November 13, 2014, and informed her again that she would need to provide a certificate from her health care provider stating she was able to return to work on November 14, 2014." (ECF No. 37 at 13; *see also* ECF No. 38-15.) "The Notice also explained that although Ms. Herrmann's FMLA leave had been exhausted, she may request a department approved leave of absence, may propose reasonable alternatives that would allow her to return to work, and encouraged Ms. Herrmann to continue working with Ms. Green." (ECF No. 37 at 13; *see also* ECF No. 38-15.) Importantly, the "Notice also informed Ms. Herrmann that if she was unable to provide the certificate and return to work, that she would be separated from her employment due to unavailability on November 14, 2014." (ECF No. 30 at 23; ECF No. 37 at 9.)

"By November 7, 2014 Ms. Green had not received a copy of th[e] additional recording and followed up with Ms. Herrmann, requesting Ms. Herrmann provide all additional

recordings she would like Ms. Green to consider by November 13, 2014." (ECF No. 30 at 21–22; ECF No. 37 at 9.) "On the afternoon of November 12, 2014, Ms. Herrmann responded saying that she had already played for Ms. Green the recording that Mr. Klein listened to and used to make his recommendations." (ECF No. 30 at 22; ECF No. 37 at 9.) There is no genuine dispute that Ms. Hermann provided no additional recordings.

"On November 12, 2014, Ms. Herrmann obtained a letter from Mr. Klein regarding her release to work." (ECF No. 30 at 23; ECF No. 37 at 9.)  It states:

> Ms. Herrmann asked me to write a letter of release for her return to work. She informed me she has been notified that if she does not start work immediately, she will be fired.  I told her that as her behavioral health care provider, I could not write such a letter in good conscience. I do not believe she is fully recovered and ready to return to work at this time.
>
> I have concerns for her health, but if Ms. Herrmann does return to work at this time, I highly recommend she **not** be assigned to an active role in a courtroom setting. I also recommend that she be placed in another department.

(ECF No. 31-45 at 1 (emphasis in original).) "For reasons unknown, Ms. Herrmann did not provide that letter to the City and return to work." (ECF No. 30 at 23; ECF No. 37 at 9.) There is no genuine dispute that "[i]nstead, Ms. Herrmann emailed Curtis Preece and asked for 'an accommodation under [her ADA] . . . to extend the date, because I need more time to review this separation agreement.'" (ECF No. 30 at 23 (quoting ECF No. 31-46 at 1.) "Ms. Herrmann was referred to Ms. Green to address any requests for accommodation under the ADA." (ECF No. 30 at 23.) Ms. Herrmann then emailed Ms. Green and requested "that additional time be provided for leave of absence as an accommodation for [her] disabilities." (ECF No. 31-41 at 1.)

There is no genuine dispute that on November 14, 2014, Ms. Herrmann was separated from employment. On that same day, Ms. Green informed Ms. Herrmann she was closing the request because she was unable to determine from the information provided what type of

supervisor might be best for Ms. Herrmann." (ECF No. 30 at 22; ECF No. 37 at 13.)

## Standard of Review

Summary judgment is proper when the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The court must "view the evidence and draw reasonable inferences therefrom in a light most favorable to the nonmoving party." *Commercial Union Ins. Co. v. Sea Harvest Seafood Co.*, 251 F.3d 1294, 1298 (10th Cir. 2001).

## Analysis

Ms. Herrman's Complaint contains three claims for relief—(I) failure to provide reasonable accommodations, (II) disability discrimination, and (III) retaliation—all in violation of the Americans with Disabilities Act (ADA). The City argues that "[j]udgment should enter for the City on all [three] of Ms. Herrmann's claims." (ECF No. 30 at 45.) The court addresses each of the City's arguments in turn.

I.    Failure to Provide Reasonable Accommodations Claim

In her Complaint, Ms. Herrmann alleges that the City "was aware of [her] disability and her need for reasonable accommodations [but the City] refused to accommodate [her] disability." (ECF No. 2 at 12.)

The Tenth Circuit has made clear that because "in a failure-to-accommodate [claim] there is no need for the employee to prove what the employer's motives were at all,"  "the *McDonnell Douglas* test is inapposite." *Punt v. Kelly Servs.*, 862 F.3d 1040, 1049 (10th Cir. 2017). But the Tenth Circuit "has adopted a modified burden-shifting framework to assess" failure-to-accommodate claims—"not to decide what inferences the jury can draw about the employer's intent . . . but rather 'simply to provide a useful structure by which the district court, when

considering a motion for summary judgment, can determine whether the various parties have advanced sufficient evidence to meet their respective traditional burdens to prove or disprove the reasonableness of the accommodations offered or not offered.'" *Id*. at 1050 (quoting *Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1179 (10th Cir. 1999)).

"Under this modified framework, the employee must make an initial showing that (1) she is disabled; (2) she is 'otherwise qualified'; and (3) she requested a plausibly reasonable accommodation." *Id*. (citation omitted). "'Once the employee produces evidence sufficient to make a facial showing on her prima facie case, the burden of production shifts to the employer to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer.'" *Id*. (citation omitted). "'If the employer does either of the above, summary judgment will be appropriate for the employer unless the employee then presents evidence establishing a genuine dispute regarding the affirmative defenses and/or rehabilitates any challenged elements of ... her prima face case sufficiently to establish at least a genuine dispute of material fact as to such challenged elements.'" *Id.* (citation omitted).

Ms. Herrmann argues that she "made three categories of requests for reasonable accommodations including . . . [A] removal from domestic violence cases, [B] reassignment or transfer to a different position, and [C] additional leave." (ECF No. 37 at 20.) The City argues that Ms. Herrmann's failure to accommodate claim fails because "none of her three proposed accommodations were 'plausibly reasonable,'" and because "she did not participate in good faith in the interactive process." (ECF No. 30 at 28.) The court addresses each of Ms. Herrmann's three requests for reasonable accommodations in turn.

A.  Removal from Domestic Violence Cases

 "The federal regulations implementing the ADA 'envision an interactive process that requires participation by both parties.'" *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998) (citation omitted)). "'Where the missing information is of the type that can only be provided by one of the parties, failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the process.'" *Id*. (citation omitted). The City argues that "Ms. Green contacted Ms. Herrmann on three separate occasions asking her to clarify if she sought to be excused from all aspects of domestic violence cases or if there were certain job functions . . . that she remained capable of performing, even if the underlying matter involved allegations of domestic violence." (ECF No. 30 at 30 (emphasis in original).)

In her Opposition, Ms. Herrmann does not dispute that "she never answered Ms. Green's question or otherwise clarified for Ms. Green if she was requesting removal from all work on domestic violence cases or whether there were some tasks, like filing, that she was able to perform." (*C.f.* ECF No. 30 at 19 *with* ECF No. 37 at 9.) As detailed in the undisputed facts above, the City is correct that Ms. Herrmann never answered Ms. Green's questions about her request to be removed from all work on domestic violence cases. Ms. Herrmann's "failure to provide . . . information necessary to the interactive process precludes her from claiming that" the City violated the ADA by failing to provide reasonable accommodation. *Templeton*, 162 F.3d at 619. Ms. Herrmann's failure-to-accommodate claim related to removal from domestic violence cases fails as a matter of law.

B.  Reassignment or Transfer to a New Position

The ADA makes it unlawful for a covered entity to "discriminate against a qualified

individual on the basis of disability . . . ." 42 U.S.C. § 12112(a). The ADA defines the term

"discriminate" to include "not making reasonable accommodations to the known physical or

mental limitations of an otherwise qualified individual with a disability who is an . . . employee .

. . ." 42 U.S.C. § 12112(b)(5)(A). "The term 'reasonable accommodation' may include"

"reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). A "reassignment to a vacant

position," in turn, may include "a *re* assignment from the employee's current job to one that . . .

she desires." *Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1161 (10th Cir.

1999) (en banc).

But "[w]hen an employer selects among several possible reasonable accommodations, the

preferred option is *always* an accommodation that keeps the employee in his or her existing job if

that can reasonably be accomplished." *Smith*, 180 F.3d at 1170 (emphasis added). This is

because "'Congress saw reassignment as an option to be considered only after other efforts at

accommodation have failed.'" *Id*. at 1171 (quoting *Aka v. Washington Hosp. Ctr.*, 156 F.3d

1284, 1301 (D.C. Cir. 1998)); *see also Bundy v. Chaves Cty. Bd. of Comm'rs.*, 215 F. App'x 759,

762 (10th Cir. 2007) ("Reassignment is an option to be considered only after other efforts at

accommodation within the employee's existing job have failed.")). "Once it is appropriate to

consider reassignment,"—that is, after determining that an accommodation cannot be made to

keep an employee in her existing job—"the employer is required . . . to take reasonable steps to

accomplish a reassignment." *Smith*, 180 F.3d at 1171.

Thus, "[t]o survive summary judgment in a failure-to-accommodate case involving a

request for reassignment, the employee must first establish a prima facie case by showing,"

among other things, that "'the preferred option of accommodation within the employee's existing

job cannot reasonably be accomplished.'" *Bundy*, 215 F. App'x at 762 (quoting *Smith*, 180 F.3d

at 1179). Ms. Herrmann relies on the City's Motion to argue that she can satisfy this necessary element. (*See* ECF No. 37 at 24.) In its Motion, the City argued that "even if Ms. Herrmann had fully participated in the interactive process, the request to be accommodated by removal from <u>all</u> work on domestic violence cases was not plausibly reasonable, as a matter of law." (ECF No. 30 at 31 (emphasis in original).)

Ms. Herrmann bears the burden of demonstrating that accommodation within her then existing job—as an in-court-clerk—could not have reasonably been accomplished. In arguing that removal from *all* aspects of work on domestic violence cases would not have been plausibly reasonable, the City is simply echoing the concern underlying Ms. Green's August 22, 2014 request for further information. Again, on that date, Ms. Green wrote Ms. Herrmann an email asking Ms. Herrmann to explain "the extent to which you want to be excused from all domestic violence cases." (ECF No. 31-25 at 1.) She asked Ms. Herrmann to "clarify for [her] which of the assignments [Ms. Herrmann was] able to do and which [she was] seeking to be removed from?" (ECF No. 31-25 at 1.)

Ms. Green's question to Ms. Herrmann was made for the purpose of determining whether an accommodation could have been made in Ms. Herrmann's then existing job as an in-court-clerk. Ms. Green was unable to determine whether an accommodation could have been made to allow Ms. Hermann to continue with her existing job because Ms. Hermann never responded to Ms. Green's multiple requests. Ms. Herrmann cannot establish a prima facie case because "by failing to respond to the repeated questions for documentation concerning" the extent to which she could work on domestic violence cases, she "never triggered" the City's duty to consider reassignment. *C.f.*, *Bundy*, 215 App'x at 762.

C. <u>Additional Leave</u>

As discussed above, Ms. Herrmann must make an initial showing that, among other things, she "requested a plausibly reasonable accommodation." *Punt v. Kelly Servs*., 862 F.3d 1040, 1050 (10th Cir. 2017). In her Complaint, she alleged that the City's "failure to accommodate includes . . . its denial of additional leave." (ECF No. 2 at 12–13.) In her Opposition, Ms. Herrmann argues that she "made, in total, four requests for leave." (ECF No. 37 at 31.) She argues that she made two requests herself and two through her medical providers. (*See* ECF No. 37 at 31.)

The medical providers made their requests in October. On October 6, 2014, Dr. Nancy Foster, an advanced practice nurse and PHD, sent a fax to Ms. Harper that provided, in relevant part: "It is requested that Jamie Herrmman's . . . FMLA  be extended to November 30, 2014. If you have any questions concerning her case do not hesitate to contact me with a signed consent form." (ECF No. 38-12 at 1.) On October 9, 2014, Mr. Klein sent a similar request to Ms. Harper in a form that provided, in relevant part: "I am recommending Jamie's FMLA be extended through November 30th of this year. If there is a form you need me to fill out, please fax it to me and I will get to you ASAP." (ECF No. 38-13 at 1.)

Ms. Herrmann made her requests in November. On November 11, 2014, Ms. Herrmann wrote an email to Mr. Preece in response to the November 4, 2014, Notice of Intent to Separate from Employment Due to Unavailability. In this email, she wrote: "Due to my disability I am requesting an accommodation under my [ADA] . . . to extend the date, because I need more time to review this separation agreement." (ECF No. 38-14 at 1.) On November 12, 2014, Ms. Herrmann wrote an email to Ms. Green in which she "request[ed] that additional time be provided for leave of absence as an accommodation for [her] disabilities." (ECF No. 38-9 at 1.)

"'It is well-settled that a request for leave may lead to a 'reasonable' accommodation— such a request may allow an employee sufficient time to recover from an injury or illness such that the employee can perform the essential functions of the job (i.e., attend work) in the future.'" *Punt*, 862 F.3d at 1051 (citation omitted). But "the term 'reasonable accommodation' refers to those accommodations which presently, or in the *near future*, enable the employee to perform the essential functions of his job, and thus an employee is required to inform the employer of the *expected duration of the **impairment*** (not the duration of the leave request)." *Id*. (bold added) (internal quotation marks and citation omitted). "Without an expected duration of an impairment, an employer cannot determine whether an employee will be able to perform the essential functions of the job *in the near future* . . . ." *id*.

The City argues that Ms. Herrmann's accommodation claim related to her request for leave fails because the evidence she points to "simply" constitutes a "duration of leave requested," and is not "evidence of the expected duration of her impairment." (ECF No. 39 at 16.) The court agrees. Because Ms. Herrmann was "required to inform [her] employer of the expected duration of [her] impairment," but only noted the duration of the leave requested, her third accommodation request claim fails. The City is entitled to judgment as a matter of law on this claim.

II.    Disability Discrimination Claim

Ms. Herrmann's disability discrimination claim alleges two distinct sources of injury. First, she alleges that the City terminated her because of her disability. (*See* ECF No. 2 at 13 ("Defendant also terminated Plaintiff's employment in violation of the ADA-AA.").) Second, she alleges that the City "created a hostile working environment based on [her] disability by subjecting [her] to undue scrutiny, increasing her workload, enacting unreasonable timelines, and

unjustifiably criticizing her work." (ECF No. 2 at 13.) The court addresses these injuries separately.

A.  Alleged Discriminatory Termination

"Congress enacted the ADA with the goal of assuring 'equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities.'" *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1037 (10th Cir. 2011) (citations omitted). "The purposes of the Act include, *inter alia,* 'providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities' and 'providing clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities.'" *Id.* (citation omitted). "In accordance with these purposes . . . the ADA makes it unlawful for an employer to" *id.*, "discriminate against a qualified individual on the basis of disability in regard to," among other things, "discharge of employees . . . ." 42 U.S.C. § 12112(a).

"The ADA . . . requires proof that the plaintiff: '(1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability.'" *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 995 (10th Cir. 2019) (citation omitted). The parties' briefing focuses on the third element—whether Ms. Herrmann can prove that she suffered discrimination because of her disability.

An ADA plaintiff may prove discrimination in one of two ways. First, "[a]n ADA plaintiff may prove discrimination by providing direct evidence of discriminatory conduct." *Tesone*, 942 F.3d at 995. Second, "[w]here . . . there is no direct evidence of discrimination, a plaintiff may instead rely on circumstantial evidence." *Id.* "If a plaintiff offers no direct evidence

18

of discrimination . . . the court applies the burden-shifting analysis articulated by the Supreme

Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668

(1973)." *Id.*

Here, Ms. Herrmann argues that she "can produce direct evidence that she was

terminated because of her disability." (ECF No. 37 at 35.) Ms. Herrmann argues that the Notice

of Intent to Separate that she received on November 14, 2014 provides direct evidence that she

was terminated because of her disability. (*See* ECF No. 37 at 36.)

The Notice informed her that "effective November 13, 2014, you will have exhausted all

approved [Family and Medical Leave Act] leave time." (ECF No. 38-15 at 1.) The Notice also

stated that the City had not "received a medical certification from [Ms. Herrmann's] health care

provider stating that you are able to return to work on November 14, 2014." (ECF No. 38-15 at

1.) The Notice further provided that although Ms. Herrmann's "protected leave under the FMLA

will be exhausted, [she] may still qualify" for a "department-approved leave of absence," if she

submitted a written request by November 13, 2014. (ECF No. 38-15 at 1.) The Notice also

provided: "Since your inability to return to work *is involuntary for medical reasons*, this

memorandum is notice of a proposed action which may affect your employment . . . ." (ECF No.

38-15 at 1 (emphasis added).) The Notice informed Ms. Herrmann that she would be terminated

from her employment if she did not respond to the Notice or provide an "alternative by the stated

deadline." (ECF No. 38-15 at 2.) Ms. Herrmann focuses on the language italicized above,

arguing that it is direct evidence that she "was terminated for unavailability related to her

disability." (*See* ECF No. 37 at 36.)

In Reply, the City argues that the Notice of Intent to Separate is not direct evidence of

discrimination, and argues that the Notice of Intent to Separate is merely evidence that Ms.

Herrmann was separated "due to her exhaustion of all available leave and her 'unavailability to return to work.'" (ECF No. 39 at 21.) The City further argues that "there is no evidence the City would have taken a different course of action with a non-disabled individual who had similarly exhausted all available leave . . . ."  (*See* ECF No. 39 at 21.)

"Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons." *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002) "'In order to be direct, evidence must prove the existence of a fact in issue without inference or presumption.'" *Tesone*, 942 F.3d at 995 (citations omitted). "'A statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence.'" *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1154–55 (10th Cir. 2008) (citation omitted).

The City argues that the separation documents related to FMLA "are exactly the type of benign evidence rendered inadequate by the Tenth Circuit," and argues that "to find otherwise would preclude an employer from ever separating an employee for failing to return to work after expiration of all available FMLA leave . . . ." (ECF No. 39 at 21–22.)

"Long-term medical leave is the domain of the FMLA, which entitles covered employees 'to a total of 12 work-weeks of leave during any 12-month period ... [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) (quoting 29 U.S.C. § 2612(a)(1)(D)). "The FMLA protects up to 12 weeks of medical leave, recognizing that employees will sometimes be *unable* to perform their job duties due to a serious health condition." *Id*. (emphasis in original). "In contrast, 'the ADA applies only to those who can do the job.'" *Id*. (citation omitted). Indeed, "[i]nability to work for a multi-month period [may]

remove[] a person from the class protected by the ADA." *See Byrne v. Avon Prod., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003). As the City argues, the Tenth Circuit has made clear that "[t]he FMLA permits an employer to terminate an employee who cannot return to work after her twelve weeks of leave have expired." *McClelland v. CommunityCare HMO, Inc.*, 503 F. App'x 655, 659 (10th Cir. 2012).

The Notice of Intent to Separate does not demonstrate, "on its face," that Ms. Herrmann was terminated for discriminatory reasons, *Danville*, 292 F.3d at 1249. It can easily be interpreted to mean what it says—that Ms. Herrmann was separated from her employment because she had exhausted all available leave and was unable to return to work. Because Ms. Herrmann offers no valid direct or circumstantial evidence of discrimination, the City is entitled to judgment on this portion of Ms. Herrmann's second claim.

B. <u>Alleged Hostile Work Environment</u>

As discussed above, Ms. Herrmann alleges in her Complaint that the City "created a hostile working environment based on [her] disability by subjecting [her] to undue scrutiny, increasing her workload, enacting unreasonable timelines, and unjustifiably criticizing her work." (ECF No. 2 at 13.) In *Lanman v. Johnson City, Kansas*, the Tenth Circuit—"[a]fter reviewing the similarities between Title VII and the ADA"—held "that a hostile work environment claim is actionable under the ADA . . . ." 393 F.3D 1151, 1156 (10th Cir. 2004). Because of the similarities between Title VII and the ADA, hostile work environment ADA claims are "analyzed pursuant to the same standards applicable in Title VII cases." *Brownwood v. Wells Trucking, LLC*, No. 16-CV-01264-PAB-NYW, 2017 WL 9289453, at *7 (D. Colo. Nov. 9, 2017).

"To prevail on such a claim, a plaintiff must show that (1) [s]he is disabled within the

meaning of the ADA, (2) [s]he was subject to unwelcome harassment, (3) the harassment was

based on h[er] alleged disability, and (4) the harassment was so severe or pervasive as to alter a

term, condition, or privilege of his employment and create an abusive working environment." *Id*.

Here, the City argues that Ms. Herrmann has failed to show harassment so severe or

pervasive as to support her hostile work environment claim—the fourth element. (*See* ECF No.

30 at 39–40.) "To prevail on this element, a plaintiff is required to show that 'a rational jury

could find that the workplace was permeated with discriminatory intimidation, ridicule, and

insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment

and create an abusive working environment.'" *Brownwood*, 2017 WL 9289453 at *7 (quoting

*Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 897 (10th Cir. 2017)). Ms. Herrmann points to

seven pieces of evidence to support her hostile work environment claim:

1. A November 16, 2011 email from Mitchell Demill to Jessica Weaver where Mr. Demill

   suggests that Ms. Herrman is using FMLA leave to avoid Wednesday morning trainings.

   (ECF No. 38-22 at 1.) Ms. Herrmann was not included on this email.

2. An October 2, 2013 email from Mr. Demill to Byron Garritson, with Curtis Preece, and

   Tammy Shelton copied. In this email, Mr. Demill questions whether Ms. Herrmann

   began to complain of back pain only after her work performance was questioned by her

   supervisors. (*See* ECF No. 38-26 at 1 ("It is apparent that Jamie has not been honest with

   management regarding her back issues. These issues immediately were brought back into

   the light when her work performance was questioned.").) Ms. Herrmann was not included

   in this email. (*See* ECF No. 38-26 at 1.)

3. An October 10, 2013 written warning from Tammy Shelton to Ms. Herrmann. (ECF No.

   38-27 at 1.) In this written warning, Ms. Shelton wrote, in relevant part: "You told Curtis

that you were waiting until the filing cabinets were brought down and then you would file

them. Curtis agreed to wait on the files that belonged in those cabinets. However, many

of the items that were left on your desk to file were items that did not belong in the

cabinets being moved. You could have successfully filed those items in a timely

manner." (ECF No. 38-27 at 1.) Ms. Shelton further provided: "Your behavior places

undue burden on other City employees when they have to help perform your job duties."

(ECF No. 38-27 at 1.)

4.  An October 11, 2013 email from Mr. Mitchell to Ms. Shelton where Mr. Mitchell

complains that Ms. Herrmann should not have wasted her time trying to resolve a printer

issue but should have instead focused on other job duties. (*See* ECF No. 38-34 at 1.) Ms.

Herrmann was not included in this email. (*See* ECF No. 38-34 at 1.)

5.  August 18, 2014 email from Mr. Demill to Jennifer Sykes in which Mr. Demill states that

Ms. Herrmann is "now conveniently stating she needs to leave at 4:00 today for FMLA

reasons" and asks if they can "verify that this is for a Dr. appointment?" (ECF No. 38-23

at 1.) In response, Ms. Sykes wrote, in relevant part, that "Jamie is entitled to use her

intermittent FMLA as needed." (ECF No. 38-23 at 1.)

6.   An August 18, 2014 email from Mr. Demill to Tammy Shelton.  Ms. Herrmann had sent

Mr. Demill and Ms. Shelton an email stating that she would "need to leave at 4pm today

its FMLA related .." (ECF No. 38-24 at 2.) In response, Mr. Demill sent Ms. Shelton an

email, writing: "Predicting a headache? Can we verify that this is for a Dr. appointment?"

(ECF No. 38-24 at 1.) In response to Mr. Demill's email, Ms. Shelton wrote: "No I don't

think we can once she says FMLA. We could however ask Jennifer for confirmation."

(ECF No. 38-24 at 1.) Ms. Herrmann was not included in the email correspondence

between Mr. Herrmann and Ms. Shelton. (*See* ECF No. 38-24 at 1.)

7. A licensed clinical social worker's October 7, 2014 diagnosis of Ms. Herrmann's ADA

disability. (*See* ECF No. 38-8.)  Relevant here, the social worker wrote:

> When Jamie was in court listening to domestic violence cases, her stress
> response system would kick in and her body would automatically go into
> hyper-arousal and hyper-vigilance. When supervisors go through her desk,
> combined with an on-going fear of being terminated, the same stress
> response system kicks in whether it's a lion, a physically abusive man,
> sitting in court while taking notes about domestic violence, or walking on
> eggshells fearing for her job. In a recent session with Jamie, she brought in
> a tape recorder of some of the conversations she had with both supervisors.
> It is apparent this current work situation is not the best fit for employee and
> employer. The interactions I heard on the recordings are counter-productive
> for someone with PTSD. The supervisors were aggressive, interrupted
> Jamie repeatedly, threatened her job and even called her a liar. It was clear
> the supervisors are not professional managers by their callous tone and
> threats. Jamie had reported to me on several occasions she is in a hostile
> work environment. After listening to the recordings, I would concur and add
> harassment to the scenario. (ECF No. 38-8 at 2.)

After reviewing the evidence that Ms. Herrmann relies on, the court holds that no rational

juror could find that the workplace was permeated with discriminatory ridicule. "At most," the

evidence shows that Ms. Herrmann "struggled" to complete her workload, and as a result she

received "disciplinary action from h[er] supervisors." *C.f., Williams v. FedEx Corp. Servs.*, 849

F.3d 889, 897 (10th Cir. 2017) That court "cannot say that these circumstances created an

atmosphere sufficiently severe to qualify as being 'permeated with discriminatory intimidation,

ridicule, and insult.'" *Id*. (citation omitted).

III. Retaliation Claim

Ms. Herrmann's third claim for relief in her Complaint is for retaliation in violation of the

ADA. (*See* ECF No. 2 at 13.) She alleges that the City "engaged in retaliatory conduct by

subjecting Plaintiff to undue scrutiny, terminating her employment, terminating Plaintiff after

she requested reasonable accommodations and after she declined to provide information she

shared with her medical provider, and by terminating Plaintiff for unavailability after she requested the accommodation of additional leave." (ECF No. 2 at 14.)

When an ADA plaintiff does not offer direct evidence of retaliation, courts "analyze a retaliation claim under the burden-shifting framework delineated in *McDonnell Douglas* . . . ." *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 (10th Cir. 2007). "Following this framework, if" a plaintiff "establishes a prima facie case of retaliation, the burden shifts to" the defendant "to assert a legitimate, nondiscriminatory reason for the adverse action." *Id*. (citation omitted). If the defendant provides a legitimate, nondiscriminatory reason for its decision, the burden shifts back to the plaintiff to show that the defendant's proffered reason is "a pretext masking discriminatory animus." *See Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007). The City argues it is entitled to summary judgment on Ms. Herrmann's retaliation claim because she "cannot establish a prima facie case of retaliation or show pretext . . . ." (ECF No. 30 at 42.)

To establish a prima facie case of retaliation, Ms. Herrmann must show: "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1265 (10th Cir. 2009). The City argues that Ms. Herrmann cannot establish a prima facie case of retaliation because she fails to satisfy the third necessary element. (*See* ECF No. 30 at 43 ("Because Ms. Herrmann has no evidence of a causal connection between the protected activity of requesting an accommodation and the adverse action of separation from employment, Ms. Herrmann fails to satisfy the requisite third prong of a prima facie case of retaliation.").)

Ms. Herrmann responds that the causation element of her prima facie retaliation claim is met because the temporal proximity between the protected conduct and the adverse action

demonstrates "an inference of retaliatory motive . . . ." (*See* ECF No. 37 at 41.) Ms. Herrmann argues that she "engaged in a series of related protected activities under the ADA between approximately May 2014 and November 2014 when she requested reasonable accommodations and complained about how her supervisors treated her." (ECF No. 37 at 41 n. 214.) Ms. Herrmann was separated from employment on November 14, 2014.

In reply, the City argues that "it is well-settled that 'a three-month period [between protected activity and adverse action], standing alone, is insufficient to establish causation.'" (ECF No. 39 at 23 (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)). For this reason, the City argues that Ms. Hermann's "retaliation claim premised on 'protected activity' that occurred before August 14, 2014 (*i.e.*, three months prior to Ms. Herrmann's separation date) necessarily fails." (ECF No. 39 at 24.)

The Tenth Circuit has "held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). The City does not address any of the evidence that Ms. Herrmann relies on that occurred within six weeks of November 14, 2014. The court therefore "assume[s] for [its] purposes that [Ms. Herrmann] has established a prima facie case." *Finney v. Lockheed Martin Corp.*, 654 F. App'x 943, 948 (10th Cir. 2016).

But Ms. Herrmann must also show the City's "articulated non-retaliatory rationale is pretextual." *Id*. The City argues that Ms. Herrmann "cannot withstand summary judgment due to her inability to show pretext." (ECF No. 30 at 43.) The City argues that it had a legitimate non-retaliatory reason for ending Ms. Herrmann's employment—"[h]er exhaustion of all available leave and concomitant failure to provide a medical release indicating she was capable of performing her job duties." (ECF No. 30 at 43.)  The City argues that it is undisputed that Ms.

Herrmann "was given clear notice of the need to provide a medical release each time she applied for FMLA, and was notified on at least two occasions, October 8 and November 4, that she would exhaust all available FMLA leave on November 13, 2014." (ECF No. 30 at 44.) The City further argues that it is undisputed that by November 14, 2014, the City "had not received notice that Ms. Herrmann was released to work and she was separated from employment for . . . medical unavailability." (*See* ECF No. 30 at 44.)

"To establish a genuine issue as to pretext, Ms. [Herrmann] must demonstrate that [the City's] 'proffered non-discriminatory reason is unworthy of belief.'" *Pinkerton v. Colorado Dep't of Transp.*, 563 F.3d 1052, 1065 (10th Cir. 2009) (citation omitted). Ms. Herrmann "can meet this standard by producing evidence of 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [City's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Id.* "To establish a genuine issue regarding whether [the City's] proffered reason was pretextual," Ms. Herrmann makes two arguments.

First, she argues that the City offered evidence that the City ended her employment because it needed her help at the court, and argues that the fact that the City knew it would take six to eight weeks to fill her position undermines the City's proffered justification. The court rejects Ms. Herrmann's argument. The fact that it would have taken six to eight weeks to fill the position does nothing to support her argument that the City's proffered reason is unworthy of belief.

Second, Ms. Herrmann argues that the fact that she "actually returned to work with a medical release letter the day after she was notified that Ms. Green had closed her request for

accommodation" is evidence that contradicts the City's proffered reason for her separation from employment. (*See* ECF No. 37 at 45.) In response, the City argues that "[t]he fact that Ms. Herrmann provided a medical release after the date of her separation is irrelevant because, at the time the separation decision was made, she had neither provided a medical release nor returned to work." (ECF No. 39 at 25.) The court agrees with the City that Ms. Herrmann's second argument does nothing to demonstrate that the City's proffered reason is unworthy of belief.

Given that Ms. Herrmann's arguments "do not support a finding of pretext by highlighting some weakness or inconsistency with [the City's] explanation," the court is left only with Ms. Herrmann's temporal proximity argument. *Pinkerton*, 563 F.3d at 1066. But "temporal proximity alone is not sufficient to defeat summary judgment by showing that the employer's proffered reason is actually pretext for retaliation." *Id*. Because Ms. Herrmann has not presented any valid evidence of pretext, she has not established a genuine issue for trial on her retaliation claim. The City's Motion for summary adjudication of this claim is GRANTED.

<u>Conclusion</u>

For the reasons stated, the City's Motion for Summary Judgment, (ECF No. 30) is GRANTED.

DATED this 20th day of May, 2020.

BY THE COURT:

_____
Clark Waddoups
United States District Court Judge